**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| STATE OF WISCONSIN,<br><br>    *Plaintiff*,<br><br>     v.<br>BLOCKRATIZE INC., d/b/a<br>POLYMARKET;<br>QCX LLC, d/b/a POLYMARKET US;<br>QC CLEARING LLC;<br>and DOES 1–20,<br><br>    *Defendants*. | Case No.: _____<br><br>Circuit Court for the State of Wisconsin, Dane County, Case No. [_____]<br><br>NOTICE OF REMOVAL TO FEDERAL COURT |

**NOTICE OF REMOVAL**

Pursuant to 28 U.S.C. §§ 1331, 1441(a), 1442(a) and 1446, Defendant QCX LLC d/b/a Polymarket US ("Polymarket US"), by and through its attorneys, hereby removes the above-captioned action from the Dane County Circuit Court to the United States District Court for the Western District of Wisconsin. All named Defendants consent to this removal.[1]

This Notice of Removal is not intended and should not be construed as constituting the general appearance or appearance on the merits of Defendants in this matter. By filing this Notice of Removal, Defendants do not waive any defenses they have to this action whether in state or federal court, including, but not limited to, improper service of process and/or lack of personal jurisdiction. Polymarket US reserves the right to amend or supplement this Notice of Removal.

---

[1] In addition to the named Defendants, the State has named "Does 1-20" as defendants, *see* Compl. ¶ 13, but "naming 'John Doe[s]' will not defeat [a] named defendant's right to remove the case to federal court," *Holz v. Terre Haute Reg'l Hosp.*, 123 Fed. Appx. 712, 714 (7th Cir. 2005).

1

In support of removal, Polymarket US states as follows:

**BACKGROUND**

1.      Prediction markets, exchanges that trade a kind of derivative financial instrument known as event contracts, are an important component of modern, federally regulated financial markets.  Hundreds of thousands of U.S. consumers—and millions worldwide—rely on these markets to obtain real-time, accurate information about consequential events in politics, finance, technology, news, and sports.  Through the Commodity Exchange Act ("CEA"), Congress placed these markets squarely within a comprehensive federal regulatory regime and vested exclusive supervisory authority in the Commodity Futures Trading Commission ("CFTC").

2.      Polymarket US operates a federally licensed designated contract market that offers event contracts.  Event contracts are a type of "swap," a financial contract where two parties agree to exchange—swap—payments with each other based on a pre-agreed formula, such as the price of crude oil or interest rates.  For event contracts, the "payoff is based on a specified event or occurrence such as the release of a macroeconomic indicator, a corporate earnings announcement, or the dollar value of damages caused by a hurricane."  CFTC, *Futures Glossary: A Guide to the Language of the Futures Industry*.[2]  Polymarket US offers event contracts subject to and in full compliance with the CFTC's regulatory oversight and federal law.

3.      The CFTC itself has repeatedly reaffirmed that the regulation of exchange-traded event contracts (and other "swaps") falls squarely within its "exclusive jurisdiction" and core institutional responsibility.  7 U.S.C. § 2(a)(1)(A).  In February of this year, the CFTC filed an amicus brief in a case seeking to enjoin the State of Nevada's threatened enforcement action against another designated contract market.  *See N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-

---

[2] https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm.

7187 (9th Cir. Feb. 17, 2026), Dkt. 38.2 ("CFTC Amicus Brief"). The CFTC explained that its participation was necessary to protect against state efforts to "invade the CFTC's exclusive jurisdiction" over federally regulated derivatives trading. *Id.* at 2. "[S]ubjecting derivatives listed on a CFTC-registered [designated contract market] to State regulation," the CFTC warned, "would have destabilizing economic effects," *id.* at 28 (capitalization altered), and "erode the nationally uniform framework Congress established to reduce risk, promote transparency, and safeguard market integrity within the financial system," *id.* at 17–18. When the "federal agency charged with administering and enforcing" the CEA, *id.* at 1, seeks to defend its exclusive authority in related litigation, there can be no serious dispute about where adjudication properly belongs.

4.      The CFTC has since sought to protect its exclusive jurisdiction by filing lawsuits against multiple States that have sought to outlaw, regulate, or otherwise restrain federally regulated prediction markets. *CFTC Sues Trio of States to Reaffirm its Exclusive Jurisdiction Over Prediction Markets*, CFTC Press Release No. 9206-26 (Apr. 2, 2026) ("*CFTC Press Release*"); *see* Complaint, *United States v. Arizona*, No. 2:26-cv-02246-DMF (D. Ariz., Apr. 2, 2026), Dkt. No. 1 ("Arizona Compl."); Complaint, *United States v. Connecticut*, No. 3:26-cv-00498 (D. Conn., Apr. 2, 2026), Dkt. No. 1 ("Connecticut Compl."); Complaint, *United States v. Illinois*, No. 1:26-cv-03659 (N.D. Ill., Apr. 2, 2026), Dkt. No. 1 ("Illinois Compl."). The CFTC explained that those State efforts "intrude[] on the exclusive federal scheme Congress designed to oversee national swaps markets" and, if permitted to continue, would "undermine [the] uniformity" Congress mandated, Arizona Compl. ¶¶ 6, 63; Connecticut Compl. ¶ 3; Illinois Compl. ¶¶ 3, 36, by subjecting CFTC-regulated exchanges to a "fragmented patchwork of state regulations," *CFTC Press Release*, *supra*. This intrusion, the CFTC warned, had already "resulted in poorer consumer protection and increased risk of fraud and manipulation." *Id.*

3

5.     The CFTC emphasized that event contracts traded on designated contract markets are "swaps" within the meaning of the CEA and fall squarely within the CFTC's exclusive jurisdiction, which "prohibits States from invading" that authority.  Arizona Compl. ¶¶ 7, 10; *see also* Connecticut Compl. ¶¶ 4, 8; Illinois Compl. ¶¶ 4, 8.  Those federally regulated contract markets subject to the CFTC's exclusive jurisdiction include Polymarket US.  *See* Illinois Compl. ¶ 37; *see also id*. ¶ 24.

6.     The State of Wisconsin has chosen to invade the CFTC's exclusive jurisdiction anyway.  Without any notice or warning, Plaintiff sued Polymarket US in state court, seeking an order shutting down Polymarket US's federally regulated operations in Wisconsin.  That order would directly conflict with federal law and intrude upon the CFTC's exclusive and comprehensive authority to regulate exchange-traded derivatives markets nationwide.

7.     The Third Circuit has recently—and squarely—held that state efforts to shut down operations of federally regulated derivatives exchanges are unlawful.  *KalshiEX, LLC v. Flaherty*, --- F.4th ----, 2026 WL 924004, at *2 (3d Cir. Apr. 6, 2026).  In *Flaherty*, the Third Circuit explained that the CEA "preempts state laws that directly interfere with swaps traded on DCMs" and that "sports-related event contracts are swaps traded on a CFTC-licensed DCM." *Id.*  Another district court has also recently held the same.  *See KalshiEX LLC v. Orgel*, 2026 WL 474869, at *7 (M.D. Tenn. Feb. 19, 2026) (holding that "sports event contracts are 'swaps'" such that state law is preempted by the CEA).

8.     Exchanges like Polymarket US are subject to exclusive federal oversight, not state regulation.  Allowing state regulators to shut down derivatives trading by rushing to state courts would fracture the uniform national framework that Congress designed and that the CFTC alone may police.

9.      This Court has jurisdiction under 28 U.S.C. § 1442 because Plaintiff's suit directly targets Polymarket US's "act[ions] under" the CFTC.  In operating a designated contract market, Polymarket US acts as a "self-regulatory organization" exercising delegated authority from the CFTC.  As a self-regulatory organization, Polymarket US does not merely comply with the federal regulatory regime.  It is a frontline regulator that assists the CFTC by performing regulatory functions the federal agency itself would otherwise carry out.  CFTC Staff Advisory at 1, CFTCLTR No. 26-08 (Mar. 12, 2026) ("*Prediction Markets Advisory*").  And those functions— regulating market access, certifying event contracts for listing, and promulgating and enforcing rules to promote fair and equitable trading and to protect the market and market participants—are exactly what Plaintiff's suit challenges.  Because Plaintiff's state-court lawsuit seeks to interfere with the federal government's exclusive authority and the system of self-regulation Congress created, Polymarket US is entitled to have its federal preemption defense resolved in federal court.

10.      This Court also has jurisdiction under 28 U.S.C. § 1331.  Plaintiff's purported state-law claims necessarily turn on disputed questions about the meaning and scope of the federal CEA.  For example, to succeed on its claims, Plaintiff concedes it would have to prove that Polymarket US's event contracts are not bona fide transactions valid under the law of contracts; this will require Plaintiff to grapple with the legality of the event contracts under the CEA.  Again, this Court is the proper forum to resolve those questions of federal law.

## I.      Federal Regulatory Authority

11.      Defendant Polymarket US operates a federally regulated derivatives exchange on which users nationwide trade event contracts—derivative financial instruments that constitute "swaps" under the CEA.  *See* 7 U.S.C. § 1a(47)(A)(ii); *see, e.g.*, Arizona Compl. ¶¶ 5, 31, 35.

12.    On July 9, 2025, the CFTC formally approved Polymarket US as a designated contract market under the CEA—a designation reflecting an extensive federal finding that Polymarket US satisfies stringent requirements that govern derivatives trading on federal exchanges, including with respect to market integrity, access, transparency, financial safeguards, surveillance, and customer protection.  *See* 7 U.S.C. §§ 7(a), 7(d), 8(a).

13.    When it comes to exchange-traded event contracts, Congress could not have been clearer: the CFTC exercises "exclusive jurisdiction" over transactions involving swaps traded or executed on a designated contract market.  7 U.S.C. § 2(a)(1)(A).  That exclusivity leaves no room to target federally regulated derivatives markets with state licensing regimes, enforcement actions, or injunctive relief.

14.    Polymarket US operates in full compliance with the CFTC's comprehensive regulatory regime, including the CEA's 23 core principles and all CFTC rules governing market participant access, contract design, surveillance, enforcement, dispute resolution, and customer protection.  *See* 7 U.S.C. §§ 7(d), 8(a); 17 C.F.R. §§ 38.3(a), 38.151.

## II.    Wisconsin's Suit Directly Conflicts With Federal Law.

15.    Despite this exclusive federal regime, the State of Wisconsin filed suit under a state public nuisance statute on April 23, 2026, asserting that federally regulated event contracts constitute a public nuisance because they are illegal "commercial gambling."  Compl. ¶ 61 (citing Wis. Stat. § 945.03(1m)).

16.    Plaintiff's theory is that Polymarket US's activities constitute "commercial gambling."  Compl. ¶¶ 60–70.  Plaintiff claims that Polymarket US "for gain, receiv[es], record[s] or forward[s] a bet," in violation of Wisconsin Statute § 945.03(1m)(b), Compl. ¶ 65; and, "[f]or gain, us[es] a wire communication facility for the transmission or receipt of information assisting

6

in the placing of a bet or offer to bet on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of a bet or offer to bet," in violation of Wisconsin Statute § 945.03(1m)(g), Compl. ¶ 66.  According to Plaintiff, Polymarket US is engaged in a "per se . . . public nuisance" because of its supposed "violations of [these] criminal statutes."  Compl. ¶ 60 (internal quotation marks omitted; alterations adopted).

17.    Yet each of these criminal provisions applies only if Polymarket has offered "bets," a term which Plaintiff concedes does not include "[b]ona fide business transactions which are valid under the law of contracts: including without limitation contracts for the purchase or sale at a future date of securities or other commodities."  Compl. ¶ 30 (citing Wis. Stat. § 945.01(a)(1) (1955)); *see* Wis. Stat. § 945.01(1), (1)(a) (similar in modern version of statute).

18.    Plaintiff requests a declaratory judgment that Polymarket US's offering of event contracts in Wisconsin violates the State's criminal prohibition against commercial gambling and thus constitutes a public nuisance; a preliminary and permanent injunction enjoining and restraining Polymarket US's Wisconsin operations; and any other relief that the court deems just and proper.  Compl. at 22–23.

19.    Polymarket US will demonstrate that Plaintiff's Complaint fails as a matter of law. Congress expressly granted the CFTC—not the States—"exclusive jurisdiction" over exchange-traded event contracts.  7 U.S.C. § 2(a)(1)(A); *see* CFTC Amicus Br. at 2.  It authorized the CFTC—not the States—to determine whether event contracts involve "gaming" and whether they may be listed or must be prohibited in the public interest.  7 U.S.C. § 7a-2(c)(5)(C).  It stripped States of the power to bring most any claim against CFTC-regulated exchanges.  *See* 7 U.S.C. § 13a-2.  And it did so to ensure that regulation of "market participants" remains "under the

oversight of the *Commission*," 7 U.S.C. § 5(b) (emphasis added)—and no "other regulatory agencies," *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386 (1982).

20.    Wisconsin's attempt to override and usurp the CFTC's exclusive federal authority through state-law injunctions is not regulation—it is unlawful displacement.

## FIRST GROUND FOR REMOVAL: FEDERAL OFFICER REMOVAL

21.    The federal officer removal statute guarantees Polymarket US the right to have its federal preemption defense heard by a federal court.  As a self-regulatory organization, Polymarket US exercises delegated authority under the supervision of the CFTC to carry out functions the CFTC itself would otherwise perform.  And Plaintiff's suit directly targets the way Polymarket US exercises that delegated authority.

22.    The federal officer removal statute authorizes removal of an action against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office."  28 U.S.C. § 1442(a)(1).  The Supreme Court has emphasized that "the statute must be 'liberally construed'" and that "[t]he words 'acting under' are broad."  *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007).  Likewise, "[t]he phrase 'relating to' sweeps broadly," and "a removing defendant need not show that his federal duties specifically required or strictly caused the challenged conduct."  *Chevron USA Inc. v. Plaquemines Parish*, 608 U.S. ---, slip op. at 7–8 (Apr. 17, 2026).  The Seventh Circuit, too, has repeatedly affirmed that removal under Section 1442 is broader than under other removal statutes.  *Hammer v. U.S. Dep't of Health & Hum. Servs.*, 905 F.3d 517, 526–27 (7th Cir. 2018).

23.    Federal officer removal "is an exception to the 'well-pleaded complaint rule,'" allowing "suits against federal officers to be removed despite the nonfederal cast of the complaint." *Kircher v. Putnam Funds Tr.*, 547 U.S. 633, 644 n.12 (2006) (alterations adopted); *see also*

*Hammer*, 905 F.3d at 525. In assessing federal officer removal, courts credit the defendant's "theory of the case for purposes" of the "jurisdictional inquiry." *Jefferson Cnty. v. Acker*, 527 U.S. 423, 432 (1999); *see also Baker v. Atl. Richfield Co.*, 962 F.3d 937, 945 (7th Cir. 2020) ("[W]hether the challenged act was outside the scope of Defendants' official duties . . . is one for the federal—not state—courts to answer.").

24.    Polymarket US satisfies the three-part test for federal officer removal because (1) it is "a person 'acting under' a federal officer," (2) this suit is "for or relating to any act under color of such office," and (3) it has "a colorable federal defense." *Plaquemines*, slip op. at 2. And because Polymarket US is entitled to remove under Section 1442, "the entire case is removable" to federal court. *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1182 (7th Cir. 2012); *see also Baker*, 962 F.3d at 945.

25.    *First*, Polymarket US is a "person acting under" the CFTC. 28 U.S.C. § 1442(a)(1); *see Ray v. Tabriz*, 110 F.4th 949, 956 (7th Cir. 2024) ("we construe the term 'person' in [section 1442] to include corporations and companies"); 1 U.S.C. § 1 (defining "person" to include "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals"). And Polymarket US acts under the CFTC because it "assist[s]," and "help[s] carry out, the duties or tasks of" the agency. *Baker*, 962 F.3d at 942.

26.    Polymarket US operates its designated contract market subject to the CFTC's direction and "an unusually close [relationship] involving detailed regulation, monitoring, [and] supervision." *Watson*, 551 U.S. at 153. To operate as a designated contract market, Polymarket US must comply with the CEA's 23 core principles and all CFTC rules governing access, contract design, surveillance, enforcement, dispute resolution, and customer protection. *See* 7 U.S.C. §§ 7(d), 8(a); 17 C.F.R. §§ 38.3(a), 38.151. The CFTC has "sweeping authority" to enforce the

9

CEA and its regulations. *CFTC v. Schor*, 478 U.S. 833, 842 (1986). The CEA expressly authorizes the CFTC to "review and approv[e] . . . event contracts" and thereby permit those contracts to be "listed" for "trading" on federally registered exchanges. 7 U.S.C. § 7a-2(c)(5)(C)(i)-(ii). The CFTC may also suspend or revoke the designation of a contract market, *id.* §§ 7b, 8(b), bring administrative enforcement actions, *id.* §§ 9, 13b, and sue in federal court for, among other things, injunctive relief, the rescission of contracts, and the imposition of trading and registration bans, *id.* § 13a-1.

27.    The relationship between Polymarket US and the CFTC, however, goes well beyond that of a highly regulated entity subject to comprehensive supervision.

28.    To achieve the purpose of the CEA, Congress established "a system of effective self-regulation of trading facilities . . . under the oversight of the Commission." 7 U.S.C. § 5(b). Specifically, Congress granted "self-regulatory organizations such as contract markets . . . a form of delegated [government] discretion" to adopt, implement and enforce regulatory protections—authority that, without contract markets, the CFTC would otherwise exercise itself. *Barry v. Cboe Glob. Mkts., Inc.*, 42 F.4th 619, 625 (7th Cir. 2022); *see* 17 C.F.R. § 1.3 (including contract markets within the definition of "self-regulatory organization"); *Prediction Markets Advisory* at 1 (contract markets have "self-regulatory obligations for the contract markets they operate").

29.    As a designated contract market, Polymarket US "'assist[s]," and "help[s] carry out*,* the duties or tasks of the'" CFTC, *Baker*, 962 F.3d at 942, including by "perform[ing] a variety of regulatory functions that would, in other circumstances, be performed by a government agency," *In re Chi. Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.*, 390 F. Supp. 3d 916, 929 (N.D. Ill. 2019) (internal quotation marks omitted); *cf. Ruppel*, 701 F.3d at 1181 ("'Acting

under' covers situations, like this one, where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete.").

30.    In its role as a self-regulatory organization, Polymarket US is specifically charged with a broad array of functions.  For example, a designated contract market is required to "establish, monitor, and enforce compliance with the rules of the contract market," including "access requirements," "the terms and conditions of any contracts to be traded on the contract market," and "rules prohibiting abusive trade practices on the contract market."  7 U.S.C. § 7(d)(2).

31.    A designated contract market also has the "responsibility to prevent manipulation, price distortion, and disruptions . . . through market surveillance, compliance, and enforcement practices and procedures."  7 U.S.C. § 7(d)(4).

32.    A designated contract market likewise must "establish and enforce rules" "to protect markets and market participants from abusive practices committed by any party, including abusive practices committed by a party acting as an agent for a participant."  7 U.S.C. § 7(d)(12).  To that end, it also must "maintain rules and procedures to provide for the recording and safe storage of all identifying trade information in a manner that enables the contract market to use the information" "to assist in the prevention of customer and market abuses."  *Id.* § 7(d)(10).

33.    These rules, the CFTC has explained, "play" an "important role . . . in promoting the integrity of derivatives markets."  *Prediction Markets Advisory* at 2.

34.    To implement or revise a rule, a designated contract market must either submit the rule for CFTC approval or certify that the contract complies with federal law and the Commission's requirements.  7 U.S.C. § 7a-2(c)(1).  The CFTC may allow the rule to go into effect, or it may stay the rule's certification pending further review.  *Id.* § 7a-2(c)(2)–(3).

11

35. Similarly, to list new event contracts, the entity must either submit the event contract for CFTC approval or certify that the contract complies with federal law and the Commission's requirements. 7 U.S.C. § 7a-2(c)(1), (4)(A), (5)(C); 17 C.F.R. §§ 40.2(a), 40.3(a), 40.11(c). The CFTC retains authority to investigate, stay, or amend the contract after it has been listed. 17 C.F.R. § 40.2(c). If the CFTC determines that a proposed "[e]vent contract" involves certain subjects, including "gaming," it has the discretion to prohibit the listing if the contract would be "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i).

36. And, once listed, designated contract markets must "provide a competitive, open, and efficient market and mechanism for executing transactions that protects the price discovery process." 7 U.S.C. § 7(d)(9)(A). They must also "establish, monitor, and enforce compliance with" rules relating to "access requirements," *id*. § 7(d)(2)(A)(i), and "establish and enforce rules . . . to promote fair and equitable trading on the contract market," *id*. § 7(d)(12)(B). To that end, CFTC regulations impose additional "impartial access" requirements, mandating that a contract market provide market participants with nondiscriminatory access and adopt and fairly enforce rules governing denials, suspensions, and terminations of access. 17 C.F.R. § 38.151(a)–(c).

37. In all of these respects, a designated contract market exercises authority delegated by the federal government, "perform[ing] a job that" otherwise "the Government itself would have had to perform." *Watson*, 551 U.S. at 154. Because Polymarket US's actions involve "an effort to assist, or to help carry out, the duties or tasks of the federal superior," the CFTC, Polymarket US "'act[s] under'" that agency. *Id*. (emphasis omitted).

38. *Second*, Wisconsin's lawsuit directly challenges actions Polymarket US takes under the authority, supervision, and jurisdiction of the CFTC.

a.  Plaintiff seeks to impose liability on Polymarket US based on event contracts that Plaintiff believes to be illegal.  *See* Compl. ¶¶ 6–7, 62–66.  But Polymarket US offers those event contracts pursuant to its status as a federally designated contract market subject to comprehensive CFTC oversight.

b.  Plaintiff says that Polymarket US offers its platform and operations to Wisconsin residents and thus engages in "criminal gambling activity" constituting "per se a public nuisance" in violation of Wisconsin law.  Compl. ¶¶ 7, 60, 70.  Yet federal law directs Polymarket US to "establish, monitor, and enforce compliance" with "access requirements," 7 U.S.C. § 7(d)(2), and provide "impartial access to its markets and services," 17 C.F.R. § 38.151(b).

c.  Plaintiff says that Polymarket establishes a market allowing "parties to . . . contracts" "to agree to terms" on "event contract[s]" that constitute illegal "bets." Compl. ¶¶ 61–64.  But federal law requires Polymarket US to "establish, monitor, and enforce [its users'] compliance" with its rules, including by setting "the terms and conditions of any contracts to be traded on the contract market" and "detect[ing], investigat[ing], and apply[ing] appropriate sanctions" to violators. 7 U.S.C. § 7(d)(2)(A)–(B).

d.  Plaintiff says that, through "its online trading services," Polymarket US operates "wire communication facilities" used by Wisconsin residents to "'transmit and receive' . . . information assisting in the placing of a bet on a[] sporting event or contest' and to 'transmit wire communications which entitle the recipients to receive money . . . as a result of a bet or offer to bet.'"  Compl. ¶¶ 66–69 (alterations adopted).  Yet federal law requires Polymarket US to "provide a competitive, open,

13

and efficient market and mechanism for executing transactions." 7 U.S.C. § 7(d)(9)(A). And, again, federal law directs Polymarket US to provide "impartial access to its markets and services." 17 C.F.R. § 38.151(b).

39.    In other words, the connection "between [Polymarket US's] challenged conduct and the performance of its federal duties" is hardly "tenuous, remote, or peripheral"—it is close and direct. *Plaquemines Parish*, slip op., at 9.

40.    *Third*, Plaintiff's claims are preempted by federal law, which qualifies as a colorable federal defense. *Ray*, 110 F.4th at 957 (holding a plausible preemption defense sufficient for federal officer removal); *see*, *e.g.*, *Flaherty*, 2026 WL 924004, at *3 (holding that the CEA preempted similar state-gaming enforcement by New Jersey); *Orgel*, 2026 WL 474869, at *1 (same with respect to Tennessee).

41.    Preemption follows from the express language of the CEA, which grants "exclusive jurisdiction" over exchange-traded swaps to the CFTC, not state regulators. 7 U.S.C. § 2(a)(1)(A). Federal law authorizes the CFTC, not state regulators, to determine whether event contracts involve "gaming" and may be listed on federally regulated exchanges. 7 U.S.C. § 7a-2(c)(5)(C). And Congress ensured that the CFTC—and no "other regulatory agencies"—would establish a uniform, comprehensive regulatory framework to avoid fracturing national derivatives markets. *Merrill Lynch*, 456 U.S. at 386; *see Am. Agric. Movement, Inc. v. Bd. of Trade*, 977 F.2d 1147, 1157 (7th Cir. 1992) (state efforts to interfere with "the operation of a contract market" "are preempted by the CEA").

42.    "One of the primary purposes of the removal statute . . . was to have [federal officers'] defenses litigated in the federal courts." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969).

43.     This Court can and should recognize its jurisdiction under § 1442(a)(1) to ensure that Polymarket US's preemption defense is fairly and fully litigated.

**SECOND GROUND FOR REMOVAL: FEDERAL QUESTION JURISDICTION**

44.     This case also belongs in federal court because it necessarily turns on disputed and substantial questions of federal law.  *See* 28 U.S.C. § 1331.

45.     Plaintiff's claims require the adjudication of federal-law issues that are "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013) (citing *Grable & Sons Metal Prods., Inc. v. Dante Eng'g & Mfg.*, 545 U.S. 308, 313–14 (2005)).

46.     Plaintiff's claim necessarily requires proof that the event contracts at issue are illegal bets—and that claim cannot be adjudicated without deciding disputed and substantial questions of federal law.

47.     Polymarket US operates a lawful, nationwide designated contract market subject to the exclusive jurisdiction of the CFTC.  The core question is whether the State of Wisconsin may nonetheless impose its state statutory regime on Polymarket US's federally licensed derivatives exchange.  But that question cannot be answered without interpreting the scope and effect of the CFTC's exclusive jurisdiction under the CEA.

48.     Take, for example, Plaintiff's claim that Polymarket US has violated two provisions of Wisconsin's prohibition against "commercial gambling."  Compl. ¶¶ 60–70 (citing Wis. Stat. § 945.03(1m)).  *First*, Plaintiff claims that Polymarket US has violated Section 945.03(1m)(b), which states that a person engages in commercial gambling where he, "[f]or gain, receives, records or forwards a bet or offer to bet or, with intent to receive, record or forward a bet or offer to bet,

possesses facilities to do so."  Wis. Stat. § 945.03(1m)(b); *see* Compl. ¶ 65, Prayer for Relief ¶ a.  *Second,* Plaintiff claims that Polymarket US has violated Section 945.03(1m)(g), which states that a person engages in commercial gambling where he, "[f]or gain, uses a wire communication facility for the transmission or receipt of information assisting in the placing of a bet or offer to bet on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of a bet or offer to bet."  Wis. Stat. § 945.03(1m)(g); *see* Compl. ¶ 66, Prayer for Relief ¶ a.  But the definition of "bet"—in both provisions—requires Plaintiff to grapple with federal law, because the Wisconsin Statutes define a "bet" such that it "does not include . . . [b]ona fide business transactions which are valid under the law of contracts including without limitation . . . [c]ontracts for the purchase or sale at a future date of securities or other commodities."  Wis. Stat. § 945.01(1)(a)(1).  Plaintiff's claim under this section thus raises the issue of whether Polymarket US's event contracts are "[b]ona fide business transactions which are valid . . . [c]ontracts for the purchase or sale [of] . . . commodities."  *Id*.

49.     That issue necessarily requires Plaintiff to contend with federal law.  *First,* determining whether a contract is "bona fide" and "valid under the law of contracts" requires an inquiry into both state and federal law.  *See Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 157 (1982) ("[T]he Constitution, laws, and treaties of the United States are as much a part of the law of every State as its own local laws and Constitution."); *Arres v. IMI Cornelius Remcor, Inc.*, 333 F.3d 812, 815 (7th Cir. 2003) (observing that "federal law is the law of the states" and states must "treat federal law as part of state law"); *Howlett ex rel. Howlett v. Rose*, 496 U.S. 356, 380 (1990) ("The federal law is law in the State as much as laws passed by the state legislature.").  "As a result, whether the contracts at issue are unlawful gambling contracts—or

16

instead federally authorized event contracts—cannot be resolved by reference to [state] law alone." *Ga. Gambling Recovery LLC v. Kalshi Inc.*, 2026 WL 279375, at *3 (M.D. Ga. Feb. 3, 2026).

50.     *Second*, Polymarket US's event contracts are lawful, valid swaps under the CEA. The CEA defines "swap" broadly, 7 U.S.C. § 1a(47)(A), such that Polymarket US's event contracts fall within its definition.  That means they are "[b]ona fide business transactions which are valid under the law of contracts," a broad term that "*includ*[*es*] *without limitation* . . . [c]ontracts for the purchase or sale at a future date of securities or other commodities."  Wis. Stat. § 945.01(1)(a) (emphasis added).

51.     Apparently recognizing this point, Plaintiff relies on a provision *outside* Wisconsin's criminal code to argue that Polymarket US's event contracts are unlawful.  *See* Compl. ¶ 31 (citing Wis. Stat. ch. 185, § 4538 (1898); Wis. Stat. § 895.055).  But, again, Plaintiff's theory is that Polymarket US is a public nuisance because the event contracts violate *criminal* law in Chapter 945.  *See id.* ¶¶ 60, 70.

52.     In short, Plaintiff's claims will fail unless it can prove that Polymarket US's event contracts are *not* "[b]ona fide business transactions which are valid under the law of contracts." Wis. Stat. § 945.01(1)(a), (a)(1).  "Thus, Plaintiff's ability to sustain a claim upon which relief may be granted necessarily depends on the interpretation and application of the CEA and the scope of the CFTC's exclusive jurisdiction." *See Ga. Gambling*, 2026 WL 279375, at *3.

53.     Allowing a state court to adjudicate the legality of—and enjoin the trading of— federally regulated swaps would fracture national derivatives markets and undermine the uniformity Congress deemed essential by granting the CFTC exclusive jurisdiction over these markets.  The CFTC said as much just this month.  Upholding federal jurisdiction here does not disrupt the federal-state balance; it enforces it.

**ALL REMOVAL REQUIREMENTS ARE MET**

54.     Based on the foregoing facts and allegations, this Court has original jurisdiction over this action because Plaintiff's claims are for or relating to actions that Polymarket US took under color of federal office.

55.     Based on the foregoing facts and allegations, this Court also has original jurisdiction over this action because the Complaint necessarily raises substantial, disputed federal questions that belong in a federal court.

56.     Venue is proper in this Court because the United States District Court for the Western District of Wisconsin is the federal judicial district embracing the Dane County Circuit Court, where Plaintiff originally commenced the state court action.  28 U.S.C. §§ 1391, 1441(a), 1446(a).

57.     Removal is timely because Polymarket US has not yet been served, meaning it necessarily has not been more than 30 days since service of Plaintiff's Complaint.  28 U.S.C. § 1446(b)(1) and (2)(B).

58.     A copy of Plaintiff's complaint is attached hereto as Exhibit 2.  28 U.S.C. § 1446(a).

59.     Polymarket US will provide Plaintiff with written notice of this filing and will promptly file a true and correct copy of this Notice of Removal with the Clerk of the Dane County Circuit Court.  The Notice of Filing of Notice of Removal to be filed with Dane County Circuit Court is attached as Exhibit 1.  28 U.S.C. § 1446(d).

60.     By filing this Notice of Removal, Polymarket US does not waive any objections as to notice, service, personal jurisdiction, venue, or any other defenses.  Polymarket US reserves all of its defenses, and this Notice of Removal is filed subject to full reservation of any rights and all objections, arguments, and defenses to Plaintiff's Complaint.

## CONCLUSION

61.     Polymarket US hereby removes this action and respectfully requests that the Court retain jurisdiction for all further proceedings in this matter.

Dated: April 24, 2026

Respectfully submitted,

*/s/Joseph A. Bugni*
HURLEY BURISH, S.C.

Joseph Bugni
Skylar R. Croy
33 East Main Street, Suite 400
Madison, WI 53703
Telephone: 608.257.0945
jbugni@hurleyburish.com
scroy@hurleyburish.com

GIBSON DUNN & CRUTCHER LLP

Orin Snyder*
Matt Benjamin*
Amanda LeSavage*
200 Park Avenue
New York, NY 10166
Telephone: 212.351.4000
osnyder@gibsondunn.com
mbenjamin@gibsondunn.com
alesavage@gibsondunn.com

Thomas H. Dupree, Jr.*
Jacob T. Spencer*
Adam I. Steene*
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
tdupree@gibsondunn.com
jspencer@gibsondunn.com
asteene@gibsondunn.com

*Applications for pro hac vice forthcoming*

*Attorneys for Defendant QCX LLC d/b/a*
*Polymarket US*